WILBUR PAUL PATTERSON, alias Pat Harris, alias William Paul Patterson, alias Pat Patterson, alias Par O'Haro, alias B. T. Johnson, v. STATE OF FLORIDA.

25 So. (2nd) 713            January Term, 1946
March 19, 1946                   En Banc
Rehearing denied May 11, 1946

*William W. Judge,* for appellant.

*J. Tom Watson,* Attorney General, *Reeves Bowen* and *Cecil T. Farrington,* Assistant Attorneys General, for appellee.

SEBRING, J.:

Wilbur Paul Patterson was placed on trial in the circuit court of Volusia County for the slaying of one Harry Raines, a member of the Daytona Beach Police Force. The jury found the defendant guilty of murder in the first degree without a recommendation of mercy. A motion for new trial was denied and judgment was entered. The defendant has taken an appeal from the judgment.

The first assignment of error argued by the appellant challenges the correctness of a ruling by the trial judge denying a motion for a change of venue. The gist of the claim made by appellant in his motion was that a series of extremely inflammatory articles published in a leading newspaper of Volusia County which reached more than ninety per cent of the adult population of the county had created such a wide and universal prejudice against the defendant as to render a fair trial in the county highly improbable, if not impossible. Attached to the motion were 32 exhibits, consisting of some 50 newspaper articles referred to in the motion, but these exhibits are not in the transcript filed here. The state filed a traverse of the motion, which put in issue the appellant's claim that he could not receive a fair trial in the county where the homicide was committed. Attached to the traverse were the affidavits of 53 citizens residing in different parts of Volusia County, each of which stated, in substance, that the affiant was well acquainted with the inhabitants of that part of the county in which he lived; that affiant had never heard any threats made or hostility expressed or displayed against the defendant; and that in his opinion the defendant could receive a fair trial by a fair and impartial jury in Volusia County. Prior to trial the trial judge heard testimony on the motion for change of venue and denied the motion.

When an application is made for removal of the cause it becomes the duty of the trial court to hear the application and either grant or refuse the same after considering the facts set forth therein and the affidavits accompanying it and any other affidavits or counter affidavits that may be filed and after hearing any witness produced by either side. See section 911.05 Florida Statutes, 1941. However, an application for a change of venue is addressed to the sound discretion of the trial court and so long as the statute is substantially complied with, a ruling refusing to grant a change of venue will not be disturbed except upon a showing that there has been palpable abuse of discretion. See Jeffcoat v. State, 103 Fla. 466, 138 So. 385; Wadsworth v. State, 136 Fla. 134, 186 So. 435. The order denying the change of venue shows that it was made on the affidavits and counter affidavits presented by the

parties, and upon additional evidence taken before the court. The "additional evidence" referred to in the order has not been brought to his court and consequently we are not advised of its substance or cogency. This being the situation, we are unable to say that the trial judge abused his discretion in refusing to enter an order removing the cause to another county, for we must presume, there being nothing to the contrary, that the "additional evidence" was sufficient, together with the counter affidavits, to authorize the order that was made. Holland v. State, 39 Fla. 178, 22 So. 298; Albritton v. State, 54 Fla. 6, 44 So. 745. Our conclusion in this respect is strengthened by the fact, we think, that a jury free from fixed opinions was procured for the trial of the issue without exhausting available veniremen in Volusia County. See Powell v. State, 131 Fla. 254, 175 So. 213.

On the trial the state produced evidence tending to prove the following facts: Wilbur Paul Patterson, the defendant, was a professional gambler who had been working in various gambling halls in the state of Florida. At the time of the homicide he was sojourning in and around Daytona Beach and Orlando, with the expectation of going to work in the gambling room of the Flamingo Club in Orlando in the near future. For several days prior to January 13, 1945, Patterson and one Dan Smith, a fellow gambler, had been on a drinking spree in Daytona Beach. On the evening of Saturday, January 13, 1945 Patterson and Smith accompanied by a female companion, one Lacey Lee Laney, left Smith's hotel room in or near Daytona Beach with the intention of driving to Orlando. Patterson, the defendant, was driving an Oldsmobile coupe owned by Smith, and the latter with the female, Lacey Lee Laney, were riding as passengers. As the car proceeded southward on the Canal Road in Daytona Beach and approached Volusia Avenue, which runs east and west, defendant observed an automobile parked on the west side of the intersection and headed west. With the exclamation, "There's a police car," defendant quickly accelerated the speed of his car until it was traveling 80 or 90 miles an hour and sped on across the intersection. Smith asked defendant to slow the speed of the car, saying, "What difference if that

was a police car?"; to which Patterson, who appeared to be visibly agitated, replied, "I can't stand to get pinched or arrested." Smith pressed the inquiry further and asked, "Why?" Patterson, who by then had apparently regained some composure, responded that he was only kidding.

After the intersection had been passed and the car had been brought down to reasonably normal speed, the parties turned back northward on a street running parallel with the Canal Road, and stopped at a bar for another drink. About dark they left the bar and started down the New Smyrna Road on their way to Orlando, with Patterson still at the wheel. As the coupe reached the southern outskirts of Daytona Beach a car drove up behind them blinking its lights and forcing them to the side of the highway. As the car overtook them from the rear Smith remarked to Patterson that he thought the pursuing car was a police car, and told Patterson to stop, which he did. Police officer Raines, who was driving the car which had overtaken the Smith car, alighted and directed the occupants of the coupe "to get out of the car." As Smith alighted from the coupe Officer Raines recognized him and, greeting him by name said "I have been looking for you or you—," but the sentence was never completed for at that moment Patterson, who had alighted from the car with gun in hand, shot the police officer three times; and then as the officer lay defenseless in the street pumped two more bullets into his prostrate form, dragged his body to the side of the road, and fled in the coupe, leaving Smith and Lacey Lee Laney behind.

The State's testimony shows that shortly thereafter Patterson came hurriedly into an establishment in Daytona Beach known as Charlie's Grill and Hi Hat Club where he asked a waitress to call the proprietor. When she didn't respond quickly to his demands Patterson shook her by the shoulders, saying "I just killed a cop, can't you understand, get him, get him fast." From that point on, the evidence is that a hostess working in the club helped Patterson escape by driving him to Jacksonville. From Jacksonville Patterson made his way to Albany and Atlanta, Georgia, to Chicago, to Sioux City, Iowa, and thence to Omaha, Nebraska. At Omaha

he was apprehended and arrested by special agents of the Federal Bureau of Investigation seventeen days after the homicide.

The state having closed its case in chief, the defendant then took the witness stand and was examined by his counsel. As to what transpired at the scene of the shooting Patterson testified to being stopped by the deceased and directed to alight; that he did not know that the occupant of the other car was a police officer nor did he have any reason to believe that such was the case because the driver was in civilian clothes and the automobile had nothing about it to indicate that it was a police car. According to Patterson, he thought that the police officer was a member of the "Mario Gang" with whom he had recently had an altercation and who was out to do him harm; that consequently he became frightened and alighted from the car with his pistol in his hand; that the deceased must have seen the gun in Patterson's hand and reached for his own, whereupon Patterson shot him and fled without knowledge that he had shot an officer of the law.

Upon cross-examination by the state attorney the defendant reiterated his statement that he did not know at the time he was stopped that the deceased was a police officer, but thought that the officer might be a member of the "Mario Gang"; that there was nothing to indicate that he might be an officer; that Smith had said nothing to indicate that such might be the case; that when he saw the deceased turn back his coat and reach for his gun he shot him; that he did not know that he had shot and killed an officer until he was apprised of the fact in Omaha, Nebraska, seventeen days later; that he had no suspicion at the time he was stopped that he might have been wanted by the police for any crime he might have been suspected of committing; that he bought the pistol with which he killed Officer Raines from a man in Orlando whose name he did not know, and that he purchased it two or three weeks before the homicide.

At this point in the cross-examination two state witnesses, James L. Flood and Homer G. Wiltsie, were brought into the courtroom and Patterson was asked if he knew them. He readily identified them as being special agents of the F.B.I.

who had arrested and questioned him in Omaha, Nebraska. After the identification had been made Patterson was then interrogated concerning his conversation with the F.B.I. Agents. In this particular he was asked the following questions and gave the following answers: "Q. I will ask you if you in substance didn't state to those officers that the pistol you shot Detective Raines with you had gotten when you robbed . . . a gambler who operated a book in West Palm Beach, in which robbery you had obtained from that man and his wife at his home approximately $4500.00." "A. No sir." "Q. I will ask you if you didn't at that time and place state to those officers, Mr. Flood and Mr. Wiltsie, in answer to their questions as to why you had shot Officer Raines, if you didn't know that you were wanted for the robbery at West Palm Beach, to which you answered that you did; and further stated that at first you thought you would get in the car and take your chances; that you knew you had the robbery charge against you in West Palm Beach, and then added the old saying, 'A guilty conscience fleeth when no one pursueth,' I guess I blew my top?" A. I don't know whether I did or not." "Q. Did you get that pistol in that robbery at West Palm Beach? A. I didn't have anything to do with a robbery at West Palm Beach. "Q. You didn't at the time and place I have designated in Omaha, Nebraska, to the officers I have just pointed out to you state where you got this pistol with which you shot Officer Raines? A. They told me, I didn't tell them. They were asking me where I got it. They asked me didn't I get it here and there, something like that. Q. Did you sign a statement in the presence of those gentlemen at that time? A. No, sir, I did not. Q. You signed nothing? A. No sir, Yes, I did. I signed a thing for them to go over and get my clothes at the hotel in Sioux City. Q. I hand you that paper and ask you if you have ever seen it before? A. I remember they asked me a lot of questions. I didn't sign it. Q. They are not your initials on the front page? A. They are my initials, I didn't put them there. Q. The initials on the second page in two places and at the bottom are not yours? A. They are mine, but I didn't put them there. A. That is not your signature there. A. That looks like it there. I don't

think I put it there. Q. You don't remember signing that paper. A. No. The paper I signed was a white piece of paper, to get my clothes out of the hotel."

The defendant objected to the questions and moved that the answers be stricken, upon grounds that will be considered later. The trial judge overruled the objections and denied the motion, and the testimony elicited was allowed to go to the jury. The defendant then announced that he rested his case, and thereupon the state called its witnesses in rebuttal.

The first rebuttal witness was James L. Flood, a special agent in charge of the Federal Bureau of Investigation at Omaha, Nebraska. He testified that Patterson was brought to the offices of the F.B.I. at Omaha, Nebraska, and there searched and questioned after first being shown Flood's credentials as a federal officer. Prior to being questioned Patterson was informed that he would not be mistreated or compelled to make a statement; that any statement made by him could be used against him in court; and that any statements made would have to be freely and voluntarily given. Patterson then recounted to Flood the circumstances of the homicide, admitted shooting Officer Raines, and stated that although Raines was in civilian clothes and the automobile in which he was riding didn't have any label on it to show that it was a police car he, Patterson, realized that his victim was an officer.

A few moments after this conversation was had Flood asked Patterson if he cared to execute a signed statement concerning the killing of the deceased. Upon Patterson's signifying his assent to making such a statement, and after again being warned of his constitutional rights in the premises, the questioning commenced and one of the officers, one Wiltsie, reduced the statement to writing in Patterson's presence. Wiltsie then handed the written statement to Patterson with the request that he read it aloud and to make corrections, if any mistakes had been made, so that the statement would reflect the truth. Patterson read the statement aloud, made some corrections in his own handwriting, and initialed the corrections. He was then asked by Flood if

he wanted to sign the statement. To this question Patterson replied: "I don't know. Could I see a lawyer?" Flood replied, "Well you can see a lawyer if you want to. We are interested in the course of questioning you at this time. Later you can call a lawyer if you want to." Appellant then asked the interrogator if he knew what the penalty was in Florida for murder. Flood answered that he was not familiar with the laws of Florida, but that the penalty for such crime was severe in every state. Patterson then said, "Well, do I have to sign the statement," to which Flood replied "No, you don't have to sign it, but if you sign it you have to sign it of your own free will." Thereupon, Wiltsie handed a pen to Patterson who, after a few moments hesitation, signed the statement.

While on the witness stand the witness Flood also testified that during the course of the examination in the F.B.I. office, Patterson was questioned concerning the manner in which he had acquired the pistol with which officer Raines was killed. Patterson replied that the gun had come from the home of a man named O'Rourke in West Palm Beach, Florida, whom he had robbed of $4500.00. Flood then asked Patterson whether at the time he was stopped by officer Raines he knew or thought that he was wanted for robbery. Patterson's answer was that at the time he was stopped by the officer he believed he would take his chances because he knew he was wanted on the robbery charges—and then he added the volunteer statement: "A guilty conscience fleeth when no one pursueth." Flood also testified that Patterson told the arresting officers that if brought to trial he thought that he would plead "defense of insanity."

The defendant assigns as error the decision of the trial judge allowing the state attorney to cross-examine the defendant concerning where he had acquired the pistol with which he shot deceased, and in allowing the state thereafter to lay the foundation for impeachment by asking the defendant whether or not he had acquired the pistol in a robbery at West Palm Beach, Florida. It is argued that the questions propounded were not in cross of anything brought out by the defendant on his examination in chief, but were propounded for the purpose of impeaching defendant upon a purely col-

lateral issue injected into the trial for the first time upon cross-examination.

It is so well settled as to be elementary, that a witness may not be cross-examined as to matters wholly irrelevant or collateral to the matter in issue for the purpose of contradicting the witness by other evidence. See Myers v. State, 43 Fla. 500, 31 So. 275; Fields v. State, 46 Fla. 84, 35 So. 185; Starke v. State, 49 Fla. 41, 37 So. 850. Where such witness is examined as to statements that are wholly irrelevant to the issue, the examiner is bound by the answer given. We think it clear, therefore, that if the questions relating to how the defendant came into possession of the pistol stood alone there would be great force to the contention that the trial judge committed reversible error in requiring the defendant to answer the questions, and thereafter in allowing the state to produce testimony of prior statements at variance. But when the question propounded to the defendant on cross-examination are considered in their entirety we do not think that the ruling of the trial judge constituted reversible error.

The offense with which defendant stood charged was the crime of murder in the first degree. The defendant, although admitting that he shot the deceased, steadfastly contended that the shooting was done without premeditated intent or design to kill the deceased, and only after the deceased had reached for his gun; that the shooting was done by defendant under the belief that the deceased was a member of the "Mario Gang" who was seeking to waylay him and do him harm. With this testimony before the jury, the issue in the case was the premeditated intent or design of the accused to unlawfully kill at the time he committed the homicide. The state had produced proof tending to prove premeditated design but the defendant had contradicted it by his assertions that the statements of the state's witnesses on the point were untrue. It follows, therefore, that as to the disputed issue of premeditation, the motive, intent and state of mind of the accused prior to and at the time of the homicide were matters of relevant and essential importance. As appears from a consideration of all the questions propounded on cross-examination with reference to this vital and disputed issue, the prose-

cution was attempting to lay a predicate for impeachment by showing that at a prior time and place the witness had made admissions to the effect that he knew that his victim was a police officer whom he feared might be wanting to take him into custody for the commission of a robbery at West Palm Beach wherein he had stolen the pistol. Such impeaching testimony, if believed by the jury, would have been of such highly material nature as to tend to discredit the defendant's version of the affair, and to authorize the jury to find upon the state's evidence that a premeditated design or intent to kill had been formed in the mind of the accused at the time he shot the officer. And although, technically, the question to the defendant should have been whether or not he had *told* the arresting officers that he had procured the pistol in a robbery at West Palm Beach, rather than whether or not he *had* procured the pistol in the robbery, we think that the error was not of such fundamental seriousness as to warrant setting aside the verdict and sending the case back for a new trial.

Objections to the reception of the written confession and the oral admission in evidence on rebuttal were also interposed by the defendant, the ground urged being that the statement elicited were obtained in violation of the defendant's constitutional right to representation by counsel.

We do not think the reception of the oral and written admissions and confessions in evidence constituted reversible error. Prior to his request for an attorney, Patterson had fully narrated to the officer, Flood, substantially the same story which was later incorporated into the written statement. Before he asked about seeing a lawyer he had made the written confession his, in effect, by reading it, correcting it in some minor detail, and initialing it. Therefore the written confession would have been admissible even though he had never actually affixed his signature to it, for by assenting to it as he did, Patterson had adopted it as his own. See People v. Siemsen, 153 Cal. 387, 95 p. 863; Underhill's Criminal evidence, 4th ed. Sec. 276; 2 Wharton's Criminal Evidence, 11th ed. p. 961, Sec. 582; 22 C.J.S. p. 1455, Criminal Law, Sec. 833.

The only thing he did in relation to the written statement after he asked about seeing a lawyer was to sign it. And this was done by him voluntarily, after being told by officers that he was free to sign it, or not, at his own volition. Under the circumstances we are of the view that the written confession was freely and voluntarily given, and was properly admitted in evidence. Underhill's Criminal Evidence, 4th ed. Sec. 276; 2 Wharton's Criminal Evidence, 11th ed. p. 961, Sec. 582; 22 C.J.S. p. 1455, Criminal Law, Sec. 833.

Substantially the same is true with reference to the oral statements concerning the West Palm Beach robbery, made by accused during the questioning by the F.B.I. agents but not reduced to writing. Patterson at all times was informed that he would not be compelled to answer questions or make a statement, but that such statements as he might make could be used against him. We fully recognize that a person charged with crime had certain fundamental rights which must be protected, and that among these is the right to representation by counsel. Walker v. State, 150 Fla. 476, 8 So. (2nd) 22. We do not understand the law to be, however, that under the circumstances shown here the defendant immunizes himself against the effect of prior incriminating admissions freely and voluntarily given simply by reason of the fact that during the course of the examination he requests, in a general way, that the arresting officers procure him the services of a lawyer without requesting any particular attorney.

We have considered all other questions urged by the appellant but shall not discuss them as we deem them to be without merit.

The judgment appealed from is affirmed.

It is so ordered.

CHAPMAN, C. J., TERRELL, BROWN, BUFORD, THOMAS and ADAMS, JJ., concur.