569 So.2d 794 (1990)
Claude J. FAUCHER, Appellant,
v.
R.C.F. DEVELOPERS D/B/a Madhatter Mufflers & Brakes and Mutual Insurance Company, Appellees.
No. 88-3069.
District Court of Appeal of Florida, First District.
October 11, 1990.
James M. Callan, Jr., Clearwater, for appellant.
Cleve A. Wilson of Butler and Burnette, Tampa, for appellees.
ZEHMER, Judge.
We review by appeal a workers' compensation order denying the claim of Claude J. Faucher for temporary total or partial disability benefits and medical benefits on the ground that he did not suffer an injury in the course of his employment with appellee, R.C.F. Developers d/b/a Madhatter *795 Mufflers & Brakes. Concluding that the record lacks competent, substantial evidence to sustain the findings upon which the judge of compensation claims based his ruling, and finding error in the admission in evidence of the deposition testimony of a witness, Beth Champagne, on purely collateral matters relating to claimant's credibility not shown to be relevant to the issues being tried, we reverse and remand for further proceedings.
Claimant contends that he injured himself on March 2, 1988, while lifting a bucket of heavy steel rollers as he was cleaning an area of his employer's shop. The filled bucket weighed at least 185 pounds, and claimant testified that he alone attempted to lift it but could not, so his foreman, Richard Stackhouse, helped him move it several feet to another location. Claimant insists that when he stood up after moving the bucket, he felt pain in his lower back and made a comment about it to Stackhouse. Stackhouse denies that claimant made such a complaint at the time, and states that he did not learn of the complaint until several days or weeks later (his testimony is indefinite about the time periods). Claimant also insists that within a few days after the incident he told his employer, Richard Fisher, about hurting himself when lifting the bucket of rollers; Fisher disputes this.
Eventually, a claim for benefits was filed and controverted by the employer and carrier on several grounds. Extensive discovery was taken and the matter came on for hearing before the judge. The record, totaling some 885 pages of evidence, consists of the transcript of the hearing, which includes the live testimony of the claimant, Stackhouse, Fisher, and Jeanine Fisher, who is Fisher's wife and the accountant for the employer. Numerous depositions and medical records were also received in evidence and made part of the record.
The order denying the claim recited the following pertinent findings of fact based on the evidence:
3. This claimant has a history of at least two (2) prior accidents in which he had low back complaints similar to those here presented. In 1974 he suffered extensive orthopedic injuries when a truck body fell on him, apparently causing a fractured hip and other injuries. Approximately June 24, 1986, he injured his right ankle when he was helping push an automobile and stepped in a hole. His medical records from the Matthew-Thornton Health Plan, a Massachusetts health provider, revealed that on March 7, 1986, the claimant had complaints of pain in the right ankle and spasm of the thoraco-lumbar muscle. On June 13, 1986 he was seen for back pain. Following his ankle injury of June 25, 1986 he continued to be seen for back pain, with diagnosis as having a L5-S1 spondylolisthesis with a "pinched nerve" with radiation of pain into both legs and pain on movement in the hips. The claimant received treatment for this condition, which was apparently severe enough to require a trial of a TENS unit. This treatment and complaint continued until the claimant left New Hampshire to come to Florida, in December 1986. The records reveal that the claimant denied any benefit from the use of the TENS unit.
4. After arriving in Florida, this claimant worked for awhile as a dry wall hanger, and then started his employment with the employer herein in October 1987, installing mufflers and doing light mechanical work. He alleges that on March 2, 1988, he was helping to lift and move a bucket of rollers, and that he injured his back doing this. The claimant alleges that his back progressively got worse until he went for medical care around March 10, 1988. He ultimately came under the care of Dr. John P. Turi, D.C., on April 14, 1988, and Dr. Turi treated the claimant through the date of his deposition (September 22, 1988), and opinioned [sic] that the claimant would reach maximum medical improvement for another thirty to sixty days. Dr. Turi, based on the history given by the claimant, related his disability to the accident in question. It is important to note, however, that the only history the claimant gave to Dr. Turi was of his 1974 accident *796 and the claimant specifically denied to Dr. Turi that he had had any similar back pain in the last four (4) years and denied that he had ever had any associated leg pain prior to this alleged accident. The employer/carrier had the claimant evaluated by Dr. R.W. Springstead, and the same history given Dr. Turi was given to Dr. Springstead. Predicated on that history, Dr. Springstead felt that as of September 9, 1988, the claimant had not reached maximum medical improvement and was in need of further conservative treatment.
5. The employer/carrier defends this claim on several grounds, the principal ones being falsification of employment application (Martin v. Carpenter defense): that the claimant did not in fact suffer an accident in the course of his employment with the employer and did not furnish notice of this accident; and that any disability and need for medical care is the result of his prior injuries in the state of New York [sic] [Hampshire]. As to the notice defense, I find that the claimant did put the employer on notice of his allegation that he had injured himself within thirty (30) days. That defense is denied. As to the Martin v. Carpenter defense, I find that the employer was well aware of the claimant's prior accident and that the claimant had pre-existing back impairment, because the claimant had been complaining with back and leg discomfort prior to the alleged accident herein, as testified to by all three witnesses produced by the employer/carrier. This defense is denied.
6. It is self evident that this claimant's credibility is severly [sic] in issue. He knowingly mis-lead [sic] his treating physician and the IME physician with denials of "previous back pain of this nature or of leg pain," which claimant obviously knew was untrue, and the claimant did not tell either physician that he was, in fact, under treatment for that very condition when he left Massachutes[1] [sic] to come to Florida in December 1986. After alleging this accident of March 2, 1988, this claimant continued to work until difficulties arose over the reporting of his complaints as compensable to the carrier and payment of medical bills incurred, after which he was no longer able to be employed.
7. I accept the testimony of the three (3) witnesses who appeared for the employer and [sic] that this claimant had continued complaints with his back and legs prior to the alleged accident of March 2, 1988, and that he did not, at first, relate his difficulties to this incident. I find that the cause of this claimant's disability and need for medical care is the continuation of the condition that he suffered in Massachusetts when he was under care there for the same problems and is the same condition that was causing this claimant to have complaints of pain in his back and legs prior to this alleged accident. In making this finding, I specifically find that the claimant did not suffer an accident by injury that arose out of and in the course of his employment on March 2, 1988.

8. In making this finding, I am well aware that the opinions of the treating physicians and the IME were that this claimant's complaints were related to the alleged accident. Their opinions, however, were predicated on a fraudulent history provided to them by the claimant and are, therefore, not binding on me.

R. 888-91 (emphasis added). The order thus denied and dismissed the claim.
On this appeal, claimant specifies five points:
1) The judge of compensation claims erred as a matter of law when he found specifically that the claimant did not suffer an accident by injury that arose out of and in the course of his employment on March 2, 1988;

*797 2) The judge erred in finding that the claimant's need for medical treatment after March 2, 1988, was a continuation of the condition that he suffered in Massachusetts (should be New Hampshire) when he was under care for the same problems and for the same condition.
3) The judge erred as a matter of law when he dismissed the employee's claim notwithstanding the testimony of Dr. Turi and Dr. Springstead because he found that their opinions were predicated on a fraudulent history provided to them by the claimant and therefore are not binding on the judge.
4) The judge erred as a matter of law when he substituted his opinion for that of the testimony of the treating physicians of the claimant's doctors, Dr. Turi and Dr. Ganuza, and the independent medical evaluator, Dr. Springstead.
5) The judge erred in admitting into evidence the deposition testimony of Beth Champagne taken on October 7, 1988, in New Hampshire without ruling on the timely objections of the attorney for claimant.
The first four stated points are interrelated and will be discussed together. The last point will then be addressed.
After carefully reviewing the entire record and correlating the numerous medical records with the testimony of the various witnesses, we agree with the claimant that the judge erred in rejecting the testimony of the physicians relating claimant's present condition to the March 2 incident when he lifted the bucket of rollers. The record simply does not contain competent, substantial evidence to support the critical findings of fact in the appealed order.
In reviewing the evidence, it is the court's function, and indeed that of a judge of compensation claims, to interpret and construe the meaning of the evidence as a whole, attempting to find as much consistency as possible in the testimony of the various witnesses, and determine what irreconcilable conflicts remain in the evidence. In doing that with this record, the following facts emerge as undisputed except as noted.
Prior to coming to Florida, claimant suffered two accidents that caused significant medical problems. First was the accident in 1971 when the truck fell on the claimant and crushed his pelvis. He eventually recovered from these injuries sufficiently to return to gainful employment doing drywall installation and working in automotive muffler shops. He had residual medical conditions, including pain from time to time in his right hip, and walked with a noticeable limp. There is no evidence that claimant thereafter lost any significant time at work because of these 1971 injuries.
In June 1985, claimant was seen at the Matthew-Thornton Health Plan clinic for complaints about multiple aching joints, primarily his elbows and knees, and was treated for this condition by Dr. Steingisser through at least November 1985. It does not appear that he lost any significant time at work based on these complaints. During this period claimant had an elevated white blood count, for which he received treatment, and lupus was ruled out. In March 1986, he was seen by Dr. Steingisser for complaints of shooting pains across the right ankle, which was diagnosed as tendonitis. At that time, claimant also complained of back discomfort on the right side. Examination revealed tightness and spasm over the thoraco-lumbar paraspinal muscles, but negative straight leg raising on the right. In May 1986, he was again seen by the clinic for sharp pains in the left ankle, once more diagnosed as mild tendonitis. The claimant was referred to Dr. Libbey, a rheumatologist, who examined the claimant on June 5, 1986, and recommended to the claimant that he take certain anti-inflammatory drugs. Dr. Libbey's report to Dr. Steingisser was inconclusive, but suggested the probable cause of pain was neurologic "and possibly an L4 radiculopathy causing the pain which he is currently having."
On June 13, 1986, the claimant complained by phone to Dr. Steingisser about "worsening back pain" and was to have some x-rays taken on June 25. On that same day, the claimant suffered an ankle *798 injury at work that was diagnosed by Dr. Steingisser as an ankle sprain. Initial treatment was with "sugartongs" to be removed in about seven days. On June 30, 1986, the claimant was advised by the clinic to call Dr. Steingisser about his "back problem." By July 7, the ankle injury was apparently worsening, and the tongs, previously removed, were reapplied. At this time Dr. Steingisser diagnosed "back pain" as an overlay of the ankle injury, and, based on the x-rays recently taken, concluded that the claimant had a "spondylolisthesis" at L5-S1 and "probable pinched nerve with spondylolisthesis." Exercises and physical therapy were recommended to the claimant as treatment for this condition. By July 18, the ankle injury appeared to be improving, the tongs were removed, and the ankle was wrapped with an ace bandage. On July 24 or 25 (indecipherable on the document in the record) the claimant was seen by a physical therapist for physical therapy treatment of "low back pain, right hip dislocation and right ankle sprain." The record indicates that the patient "states he has intermittent pain in his back running across both iliac crests and radiating up into the back and down into the legs" which "is worse when rising from squatting." Williams flexion exercises were recommended for the back pain. On August 8, 1986, claimant was again seen by Dr. Steingisser about the ankle injury, which was improving but apparently still disabling. On September 17, 1986, claimant was discharged from physical therapy after receiving 8 treatments for his back and hip. The back condition had "improved quite well" but the ankle was still presenting problems.
On November 3, 1986, claimant was again seen by Dr. Steingisser about the ankle injury. He also complained of "increasing left buttock and hip discomfort with radiation of discomfort down the left leg" which was "troublesome when he is bending" and driving with a clutch. Dr. Steingisser's assessment of his condition was "clear evidence of sciatica. In addition, regarding the right ankle, I think it would be reasonable to plan for return to work time of 3 weeks. I do believe he continues to have pain from his initial injury." The last legible[2] note in the Matthew-Thornton Health Plan medical records, dated November 11, 1986, was made by the physical therapist concerning instructions to claimant on use of "a TENS unit due to recurrent back pain and symptoms of sciatica." The physical therapist noted that the claimant "is complaining of bilateral hip pain, which he states started about a week ago when he returned from Florida. Checked out his hip joints and he did experience some pain with external rotation in a supine position. However, the tests were inconclusive."[3] The last note in this medical record appearing in the record on appeal, which appears to be dated December 2, 1986, is illegible and will be disregarded for purposes of this appeal, since the content was not deciphered by any witness competent to do so.
The claimant moved to Florida in December 1986, and commenced work in drywall construction for various contractors. There is no evidence in the record that he was unable to perform this labor, which included lifting and installing sheets of drywall up to four feet by twelve feet and weighing up to 125 pounds. He continued working in dry wall construction until October 1987, when he went to work for the employer at Madhatter Mufflers. There is no evidence that claimant was unable to perform the construction work during this ten-month period because of the ankle injury or any back problems.
Claimant's work at Madhatter Mufflers required him to install mufflers on vehicles *799 elevated on a hydraulic lift, repair brakes and shock absorbers, and make minor car repairs. To perform this work, he was required to engage in stretching and bending, and lifting materials and tires, some as heavy as large RV tires. Between October and the alleged injury in March 1988, claimant missed no more than three or four days total from work, none being for physical incapacity. The employer and his witnesses said that the claimant walked with a noticeable limp and complained about aches and pains from time to time, especially in his hips, and that he favored his right hip. At times the claimant would grimace, and he always showed some type of pain, but that did not affect his ability to work. Both the employer, Richard Fisher, and the foreman, Richard Stackhouse, confirmed these facts concerning the claimant's physical condition. According to Stackhouse, the claimant would complain of pain in his hip or leg, but never complained of pain in his back. Neither Mr. or Mrs. Fisher related any complaints by claimant of pain in his back prior to the alleged industrial accident.
On March 2, 1988, the claimant and Stackhouse were cleaning up the employer's shop. The claimant put the heavy steel rollers in a large five gallon plastic bucket which weighed some 185 pounds or more.[4] Claimant attempted to lift the heavy bucket but could not. He asked Stackhouse to assist him, and using either a two by four board (according to claimant) or a piece of metal exhaust pipe (according to Stackhouse), together they lifted the bucket about two inches off the floor and shuttled it to the back room, a distance of about 11 feet.[5] The bucket of rollers remained in that location, unmoved, until just before the hearing when Mr. Fisher weighed the contents.
The claimant contends that when he stood up after putting the bucket down he felt a pain in his back and made a comment to this effect to Stackhouse and then to Fisher. Both Stackhouse and Fisher denied that the claimant made any such statements to them on this occasion. Stackhouse did remember that later on the claimant said he hurt himself lifting the bucket, but he was not sure of the time when this was said. He was aware that the claimant was complaining of pain in his back from lifting the bucket of rollers, and that the claimant went to see a doctor because of the pain. Fisher testified that the claimant told him in a "very off-hand" manner he had injured himself when lifting the bucket of rollers several days before, but Fisher did not pay much attention to it. The claimant told him this before the claimant first went to see a doctor about it. Although the claimant continued working after the March 2 incident, his condition steadily worsened and he finally went to see a doctor about his back pain on March 10.
The big dispute over whether claimant was injured at work or not stems primarily from the testimony of Mr. and Mrs. Fisher that the claimant never told them for sure that he had hurt himself at work until well into April, when he made his workers' compensation claim after he had seen several doctors.[6] This testimony really is not disputed *800 by the claimant, who testified both on deposition and at the hearing that initially he was not sure that his worsening pain was caused by the lifting incident or something else, and wanted to see a doctor to find out the cause of the pain. It is clear from the testimony of claimant, the physicians, and the employer's witnesses that claimant at all times related the onset of pain as commencing immediately after the lifting of the bucket of rollers, and that he did not make any judgment as to the particular cause of his pain, but was leaving that for the doctors to explain.
The claimant saw Dr. Cummings by referral from his family doctor's office on March 10, 1988. The claimant told Dr. Cummings that he thought he had hurt his back when he lifted the bucket of steel rollers.[7] Dr. Cummings ordered x-rays of the claimant's back, which were made on March 15, and referred him to Dr. Carlos Ganuza, a rheumatologist.
Dr. Ganuza first saw the claimant on March 18, and recorded that the claimant "described that the pain started after lifting heavy objects at work." Dr. Ganuza described the claimant's complaints as "pain in the right hip and leg, and he actually was referring to the lower back radiating to the leg." Continuing, the doctor's notes reflect claimant said that "later the pain has involved the thigh and the calf and he complains of having an area of numbness in the lower half of the leg." Other than what was recorded in his office notes, Dr. Ganuza could not remember much about what the claimant told him. He made a note about a car accident, but does not remember what was said. Dr. Ganuza ordered an MRI, which was done on March 28. He saw the claimant again on March 31, April 7, and April 14. The MRI indicated no clear evidence of a herniated disk but showed a narrowing of the space between L5-S1, probably a long-standing condition. He put claimant on two weeks bed rest. Regarding the history given to him, he did not take any prior history; he takes only present history (what caused the present complaints) while his office assistant takes past history. He only reviewed the past history with the patient, but could not remember the conversation. His diagnosis was "no herniated disk but some problem with the disk in way of degenerative disk disease." He said that trauma can aggravate this disk disease condition. He last saw the claimant on April 14.
The claimant, being unhappy with the progress he was making under Dr. Ganuza's care, went to see Dr. John Turi, a chiropractor, on April 14, 1988. The claimant told Dr. Turi that he lifted a bucket of steel and started to get the pain in his low back afterwards, and it got worse and worse. The claimant explained that he had seen a chiropractor before this for back pain, but that it was not the same type of problem, that this was different, and that "he never had anything like this happen to him before as far as leg pain." Dr. Turi described the claimant as in such pain he was barely able to walk. Dr. Turi's diagnosis was a grade one spondylolisthesis (L5 had slipped over S1), vertebral subluxation complex with associated lumbosacral sprain and sciatica. He attributed all of these conditions except the preexisting spondylolisthesis to the trauma from the accident. He said the claimant was pretty sure that he injured himself when picking up a bucket of steel. He described his treatment of the claimant, who had shown improvement in his condition as a result, and was still treating the claimant at the time of the hearing.
The carrier arranged for the claimant to be examined by Dr. R.W. Springstead, an orthopedic surgeon, on September 9, 1989. The history given him by the claimant was that he picked up a bucket of steel rollers and felt some pain in his right hip which *801 got progressively worse. He went to see his doctor and was bed ridden for two weeks. The claimant said Dr. Turi told him he was suffering from a pinched nerve. The claimant said he still had stabbing pains in the right buttock down to his knee and that he mentioned the fractured pelvis, but said that he had been able to work since recovering from it. Upon examination, Dr. Springstead determined that claimant had a spondylolisthesis at L5-S1, grade one meaning a minimal or slight condition, which had existed for a number of years. The doctor explained that a person with this condition would not necessarily experience pain, and that he could not say the type of work described to him as being performed by the claimant would or would not cause pain. He would not be surprised that such person experienced pain before this accident, however. He does not recall that the claimant said anything about his having any problem with his back before this; the claimant mentioned the broken pelvis, but said he got over that and was able to return to work. When asked if the claimant mentioned any problem with his leg or hip prior to this accident, the doctor responded, "I don't believe he  he didn't relate any of that to me, no." Dr. Springstead opined that the claimant had not reached maximum medical improvement, and he related the claimant's present condition to the March accident based on what the claimant told him. He explained that the claimant suffers from a long-standing condition that was aggravated from irritation and swelling due to trauma the claimant described.
We hold that the judge erred in finding that the claimant's need for medical treatment after March 2, 1988, was a continuation of the condition that he had previously suffered in Massachusetts [New Hampshire],[8] in total disregard of the testimony of Drs. Turi and Springstead on grounds their testimony was based on a fraudulent history given them by the claimant, and in substituting his own opinion for their medical opinions as to the cause of claimant's current medical condition. It is now well settled that a doctor's medical opinion cannot be disregarded by the judge of compensation claims because the judge finds that the history given such doctor by the claimant was either false or incomplete, unless appropriate questions are put to the doctor specifically inquiring about the effect of the false or omitted information on the doctor's previously expressed opinion. Jones v. Citrus Central, Inc., 537 So.2d 1123 (Fla. 1st DCA 1989); Carson v. Gaineswood Condominiums, 532 So.2d 28 (Fla. 1st DCA 1988); Curtis v. Florida Correctional Institute, 509 So.2d 1192 (Fla. 1st DCA 1987). See also, Morey v. Harper, 541 So.2d 1285 (Fla. 1st DCA), rev. denied 551 So.2d 461 (Fla. 1989); Olsen v. Wellcraft Marine Corp., 540 So.2d 878 (Fla. 1st DCA 1989); Walker v. Allied Septic Tanks, 522 So.2d 456 (Fla. 1st DCA 1988); Jackson v. Dade County School Bd., 454 So.2d 765 (Fla. 1st DCA 1984); Allman v. Meridith Corp., 451 So.2d 957, 960 (Fla. 1st DCA 1984).
In the instant case, Dr. Turi was the claimant's treating doctor and he causally related the lifting episode on March 2, 1988, to claimant's current complaints based on the history given to him by the claimant. Dr. Turi's deposition testimony does not support the finding in the order that "the claimant specifically denied to Dr. Turi that he had had any similar back pain in the last four (4) years and denied that he had ever had any associated leg pain prior to this alleged accident." No questions were put to Dr. Turi inquiring whether his expressed opinion would change based on the specific details of claimant's prior complaints regarding back and leg pain as shown in the detailed medical records placed in evidence by the employer and carrier. It was pure speculation for the judge to conclude that such information would have altered the doctor's opinion. The claimant had recovered from the back *802 complaints for which he was treated in 1986 by Dr. Steingisser sufficiently to engage in heavy construction work and to perform work in the muffler shop with the employer without loss of time due to such medical condition for some 14 months. There is no dispute that the claimant's spondylolisthesis had existed for some time, but that condition was shown not to cause continuous pain and disability. Rather, each doctor related the claimant's complaints of back pain, both in 1986 and after the March 2, 1988, incident, to irritation and swelling in the area of the spondylolisthesis at L5-S1 which could be attributable to aggravation or trauma due to physical activity. Thus, it is highly doubtful, in view of the claimant's undisputed work history in 1987 and early 1988, that the painful back condition reoccurred without some external stimulus such as the physical activity described in lifting the bucket. Whether it was this incident or some other incident that aggravated the condition, or whether the condition simply reoccurred spontaneously, are all matters on which the trier of fact should have expert medical testimony. It was, therefore, error for the judge to totally disregard Dr. Turi's unrefuted opinion on medical causation.
Likewise, with respect to the independent medical examiner, Dr. Springstead, no questions were put to him concerning the undisclosed prior medical history so as to inquire whether that additional information would change his expressed opinion on causation. Therefore, it was also not appropriate for the deputy commissioner to completely disregard his unrefuted medical opinion on causation.
Additionally, we find a lack of record support for the finding recited in the order that the claimant "knowingly" misled Dr. Turi and Dr. Springstead "with denials of `previous back pain of this nature or of leg pain,' which claimant obviously knew was untrue, and the claimant did not tell either physician that he was, in fact, under treatment for that very condition when he left Massachusetts to come to Florida in December 1986." In the first place, it is not so clear on this record that the claimant was suffering from the same condition when he moved to Florida in 1986. The medical records in evidence were not explained by any competent physician, but it is apparent from our reading of those records that the claimant was recovering from the back pain he had been experiencing in conjunction with the treatment of his ankle injury. His subsequent work experience over the ensuing 14 months in Florida confirms this recovery. These medical records, moreover, do not demonstrate that the claimant's back pain on this occasion was nearly as severe as that observed by Dr. Turi in April 1988, so it is speculative to simplistically equate the symptoms and resulting conditions in both instances as being identical.
More significantly, the record does not establish the conversations between the claimant and either Dr. Turi or Dr. Springstead so as to support an inference that the claimant knowingly misled them by intentionally refusing to disclose specific information sought by either physician. Thus, it is impossible to determine from this record whether the questions put to the claimant by either doctor clearly put the claimant on notice that he was to discuss the details of his treatment in 1986. He told Dr. Turi about the injured ankle in 1986, which the claimant related to his back problems, and further particulars of the claimant's discussion with Dr. Turi are not shown on the record. It must be remembered that the employer and carrier arranged for Dr. Springstead's examination of the claimant, and the claimant was not necessarily relying on Dr. Springstead to establish the causal relation between the March 2 lifting incident and his present condition. For aught disclosed by this record, the claimant was under the impression he was going to Dr. Springstead only for a medical evaluation of his present condition. The record does not contain what instructions were given to the claimant concerning the importance of giving a complete medical history to Dr. Springstead, nor does the record reveal what the conversation was between the claimant and this doctor. Dr. Springstead only testified that the claimant did not disclose certain information *803 about his past medical history. Whether the questions put to the claimant by the doctor would support an inference of knowing and intentional falsification cannot be discerned on this record because fraudulent representations must be proven through the words spoken, not merely a characterization of the information imparted. The judge's characterization of the history given by claimant to these doctors as being fraudulent is not supported by competent substantial evidence.
While we do not intend to usurp the trial judge's power to determine the credibility of witnesses, we do feel constrained to emphasize that our review of all the evidence fails to disclose substantial evidence that the claimant was attempting to falsify his claim in this instance.[9] The testimony of the claimant and the employer's witnesses are significantly without dispute on certain critical facts. The lifting incident occurred as described, and shortly thereafter the claimant complained of back pain that continued to worsen to the point that he sought medical care and could no longer perform his work. Whether the lifting incident was sufficient to aggravate the claimant's preexisting back condition so as to cause the onset of the back pain is the critical issue, and resolution of that issue depends primarily on expert medical testimony based on a full discussion of claimant's undisputed prior medical history.
We next address the deposition of Beth Champagne, which was offered by the employer and carrier on the issue of the claimant's credibility. This witness had performed surveillance of the claimant in October and November 1986 while he was drawing workers' compensation benefits in New Hampshire as a result of his ankle injury. She testified to her observations of the claimant's activities on diverse days, and described videotaping this activity. The claimant's attorney objected to this testimony on various grounds, including lack of timely notice (1 and 1/2 hours notice) and lack of relevancy to any issue in the Florida workers' compensation proceeding. The employer and carrier's attorney stated in the deposition, in response to the claimant's attorney's objection, that this evidence was relevant to the issue of the claimant's credibility because
The surveillance which Ms. Champagne will testify to was conducted relevant to a contested Worker's Compensation claim in the State of New Hampshire. At that time serious issues existed as to the credibility of Mr. FAUCHER's statements that he was not capable of being gainfully employed during the period of time that the surveillance was being done. The veracity and the reliability of Mr. FAUCHER's statements and actions relative to his ability to engage in gainful employment surely is relevant before the Judge who will hear this case.
(R. 586). At the hearing, the employer and carrier's attorney further explained that this evidence was relevant to prove that the claimant made an unfounded workers' compensation claim in New Hampshire in that he was contending that he could not work when in fact he engaged in certain physical activities on several occasions that tended to show otherwise. The judge said he would take this objection under advisement and rule on the objections later. No specific ruling was made, but the deposition was made part of the record.
We do not consider the objections regarding reasonable notice. It is perfectly clear that this deposition was an attempt to litigate a purely collateral matter solely for the purpose of attacking the claimant's credibility. There was never any hearing on the disputed issue in the New Hampshire proceeding, and nothing in the witness's deposition establishes any particular statement by the claimant that was impeached *804 by Champagne's testimony or the surveillance. At best, this was a disputed situation between the parties as to the precise truth. In order to impeach the claimant's credibility in the instant proceeding based on this deposition testimony, it would have been necessary to litigate the true state of facts asserted by both parties in the New Hampshire proceeding. This is clear error.
The law is well settled that it is improper to litigate purely collateral matters solely for the purpose of impeaching a party or witness. Once a question is put to the party or witness on a purely collateral matter for the purposes of impeachment, the proponent of the question is bound by the witness's answer; it is inappropriate to then try the truth or falsity of the answer on the collateral matter by adducing independent proof through other witnesses. Patterson v. State, 157 Fla. 304, 25 So.2d 713 (Fla.), cert. denied, 329 U.S. 789, 67 S.Ct. 352, 91 L.Ed. 676 (1946); O'Steen v. State, 506 So.2d 476 (Fla. 1st DCA 1987); McCormick on Evidence § 47 (3d ed. 1984). In the instant case, not only was it inappropriate to try the unresolved issues in the New Hampshire proceeding before the Florida judge, but the appellees have not pointed to any place in the record wherein they even established a predicate for impeaching the claimant on the basis of his statements and conduct in that proceeding. The deposition of this witness should not have been received over the objections raised by the claimant.[10]
In view of the errors herein discussed, the appealed order is reversed and the cause is remanded for further proceedings consistent with this opinion. On remand, the judge of compensation claims is to reconsider the validity of the claim in light of this opinion, and may receive additional evidence if that is deemed prudent and necessary.
REVERSED AND REMANDED.
ERVIN, J., concurs. NIMMONS, J., dissents with opinion.
NIMMONS, Judge, dissenting.
I would affirm. In my view, the J.C.C. was justified in finding that the opinion testimony of Doctors Turi and Springstead was flawed by reason of the materially untruthful history given them by the claimant.
With respect to the issue concerning the deposition testimony of Beth Champagne, the argument advanced on appeal by the claimant (consisting of a total of one page  including both initial and reply briefs) is inadequate.[1] In any event, even if error, I would find such to be harmless.
NOTES
[1] This is obviously an inadvertent error, as the record shows claimant left New Hampshire, not Massachusetts.
[2] We specify legible because substantial portions of the medical documents in this record are wholly illegible. Such illegible documents cannot be regarded as competent substantial proof of anything, and will be disregarded in our evaluation of the evidence in the record on appeal.
[3] The claimant's testimony, particularly in response to questions by the judge, related the back pain and use of the TENS unit to the effects of his ankle injury and having to walk abnormally to accommodate to that problem. This assumption on his part is not inconsistent with the medical records summarized above.
[4] The claimant and Stackhouse estimated, before weighing the bucket of rollers, that it weighed about 250 pounds.
[5] Stackhouse testified, "We lifted it up and we just cleared the ground by a couple of inches, shuttled it to the back room." (R. 144). He measured the distance the day before the hearing and determined it was 11 feet. (R. 143).
[6] For example, Mr. Fisher testified at the hearing on direct examination by his counsel:

Mr. Faucher had mentioned [the accident involving the bucket] prior to the filling out of the report that he thought he had hurt himself with a bucket of rollers that he had moved while cleaning the building. But he didn't know how he hurt himself. He thought that he did. He thought he might have hurt it some other way and it kind of revolved on the 14th [April 14, the date the signed claim was made]. He said that he did hurt it definitely with the rollers and asked to fill out a report which Mrs. Fisher did.
(R. 124). Mr. Fisher further testified:
Q... . When Mr. Faucher first mentioned to you that he felt he might have been hurt picking up the bucket of rollers, was it your impression that he was sure that that is how he had injured himself?
A. No. He told us that he wasn't sure how he hurt himself, several times, six or eight times over a period of, you know, I can't be exact on that. I would say a period of a couple of weeks. And then he did not hire  he had a little pain in his side or back, wherever, at times, and he said that he was hurting and he didn't really know how he hurt himself. And what he did  what he had did to hurt himself. and it's kind of involved. (R. 132).
[7] Claimant's testimony to this effect was not refuted by any evidence in the record.
[8] The reference in the order to Massachusetts was apparently an inadvertent error. However, since the claimant's treatment for the pelvic injury in 1971 was in a Massachusetts hospital, we cannot be certain whether the judge is referring to that injury or the more recent complaints about back pain from May to December 1986.
[9] It is true that during his deposition the claimant generally denied having any previous complaints of leg or back pain, which the judge correctly observed was untrue. Whether the claimant was uncertain about the intent of the questions, as he stated at the hearing, or simply failed to disclose requested information, does not necessarily prove he fabricated his claim, however. On deposition, the claimant had already discussed the ankle injury, which he consistently treated as being related to his back pain at that time, and no questions were put to him about any specific instances of complaints of back pain.
[10] Although claimant's argument on this issue is concise and without citation to authority, the correctness of claimant's objection and the irrelevancy of this evidence is obvious and probably needs no discussion. Since we have remanded for further proceedings, we have included a more extended discussion of this issue primarily to explain the error in the argument made in the answer brief filed by the employer and carrier in support of the admissibility of such evidence.
[1] The entire argument in the initial brief is reproduced as follows:

It is impossible to determine what effect the deposition testimony of Beth Ellen Champagne had on the Deputy Commissioner. Her testimony (R 577) dealt with her surveillance of the claimant in 1986 after the claimant had sustained an ankle injury while working for Rod's Automotive in June of 1986. Her testimony revealed that she had followed the claimant and taken movies of the claimant in New Hampshire performing certain activities. The attorney for the employer/carrier, Mr. Wilson, tried to show to the Deputy Commissioner, Douglas, was relevant to the issues that were pending before him.
The Deputy Commissioner was required in his order to set forth the reasons why he accepted her deposition into evidence over the objections of lack of notice, surprise, and relevancy raised by the attorney for the claimant.
The appellant's argument in his reply brief is as follows, in its entirety:
It is true that it was within the sound discretion of the Deputy Commissioner to determine whether the deposition of Beth Champagne would be admitted in evidence, but he must recite in his order why he is denying Appellants' objections to its admission. The attorney for the Appellee states in his brief that if in fact there was error, it was harmless. If the admission of the deposition testimony of Beth Champagne was so harmless why did the attorney for the Appellee spend so much time in his brief (pages 16, 17, and 18) commenting and discussing her testimony in detail.