589 So.2d 373 (1991)
Carlyle Francis DEMPSEY, Appellant,
v.
SHELL OIL COMPANY, a Delaware Corporation, and William J. Irwin, Appellees.
No. 90-1858.
District Court of Appeal of Florida, Fourth District.
November 13, 1991.
Rehearing Denied December 18, 1991.
*374 Scott Mager, Cooney, Ward, Lesher & Damon, West Palm Beach, and Joseph Glick and Charles Prince, Fort Lauderdale, for appellant.
Joe N. Unger, Law Offices of Joe N. Unger, P.A., Miami, and Joel Kaplan, Kaplan & Freedman, Miami, for appellees.
ANSTEAD, Judge.
This is an appeal by the plaintiff, Carlyle Francis Dempsey ("Dempsey"), from an adverse final judgment in a personal injury action brought after he was struck by a vehicle owned by defendant Shell Oil Company, and driven by co-defendant, William Irwin ("Irwin"), a Shell Oil employee. Because of errors we believe took place in the receipt or exclusion of evidence we reverse.

FACTS
On December 23, 1985 at approximately six a.m., Dempsey was struck by a Shell Oil vehicle under nighttime conditions on unlit State Road 84, just east of its intersection with Pine Island Road, in the town of Davie. A lighted 7-Eleven sign and the traffic signals at the intersection were the only sources of illumination, other than the headlights of the Shell Oil vehicle. Dempsey was walking to work at Sears, following the same route he had taken daily for the previous 3 1/2 years, and was attempting to cross the three eastbound lanes of State Road 84 from south to north. Irwin was travelling from west to east with his low beam headlights and testified by deposition *375 that he first saw Dempsey approximately 100 feet prior to the impact. There were no eyewitnesses to the accident other than Irwin and Dempsey. Each claimed to have had the green light. Dempsey suffered multiple fractures, for which he was hospitalized many times and is permanently disabled.
At trial, Dempsey's expert witness, David Wiggins, a mechanical engineer and accident reconstruction expert, proffered the results of an experiment conducted in 1982 in which he measured headlight sight distances of a stationary vehicle. The trial court refused to admit the results of the experiment.
Subsequently, Shell Oil called Dr. Joseph Wattleworth, an expert in accident reconstruction, who testified that in his opinion Irwin was able to see Dempsey about 150 feet away from the point of impact. Based upon that determination and other information, he concluded that Irwin could not have avoided the collision. On cross-examination, Dempsey was not permitted to question Wattleworth as to the distance objects could be seen with low beam headlights, or as to what role such visibility may have played in the accident. Dempsey was permitted to ask Wattleworth whether he had considered headlight sight distance as part of his reconstruction and opinion. When Wattleworth replied in the negative, the trial court refused to allow further inquiry on the matter. Wattleworth had testified in a pretrial deposition that under nighttime conditions, at a speed of 40 mph, 200-250 feet was a safe distance within which to reveal objects, including pedestrians.
Shell read into evidence a portion of Dempsey's deposition, wherein he denied being involuntarily terminated from a prior job that he had years before the subject incident. Thereafter, Shell was allowed to call a former employer of Dempsey to testify that Dempsey had, in fact, been involuntarily terminated from that position due to carelessness.

IMPEACHMENT ON COLLATERAL ISSUE
Dempsey contends the trial court erred in allowing him to be questioned and impeached about the manner and reasons for his separation from the prior job, which he contends is a collateral issue, since he made no claim for lost wages or loss of earning capacity. At trial the following exchange took place:
Mr. Kaplan [Counsel for appellees]: Did you want to take something up?
Mr. Glick [Counsel for appellant]: Yes.
Your Honor, we just have a motion to make before we start this morning. It's been brought to our attention, Mr. Kaplan and I have been talking, that one of the witnesses that he plans to call this morning is a lady by the name of Marchita Ott, O-T-T, who I believe is in the personnel department at Bennett Community Hospital where Mr. Dempsey was employed some time ago back in I believe it was around 19  Late 1970s, 1980. And the reason that Mr. Kaplan has advised me for bringing this witness is for impeachment purposes. I believe what she's going to testify to is that Mr. Dempsey's employment at the hospital resulted in him being terminated or fired from that position. Now there is no claim being made in this case for lost wages 
The Court: Any particular reason, or just the fact that he was terminated?
Mr. Glick: Well, I believe in Mr. Dempsey's deposition a question was asked of him, something to do with whether his employments had all been voluntary departures or not or a question to that effect.
But there is no claim, Your Honor, being made in this case for lost wages or lost earning capacity. When the complaint was filed in this case, there was no claim made in the capacity. So this is purely collateral. And my understanding of the Rules of Evidence are that if Mr. Kaplan wanted to impeach the Plaintiff, the witness, with this, you know, he can ask him the question on cross examination. But he's precluded from bringing in collateral evidence of that, inasmuch as it's a collateral matter. *376 It has no independent relevancy to this particular lawsuit.
The Court: All right. Response?
Mr. Kaplan: First of all, it goes to the instruction on the believability of a witness, whether he's telling the truth. I am going to bring this in for impeachment purposes.
The Court: Just stop there a minute. Impeachment purposes of what? I haven't heard anything.
Mr. Kaplan: Here we go.
The Court: Go ahead.
Mr. Kaplan: I haven't started my case yet. I'm going to read before she gets on the stand from his deposition of the party, from his deposition, the following questions. And I'll bring it right down to the bottom.
The Court: Sure.
Mr. Kaplan: `Question: Were both of your departures voluntary? Yes, they were both voluntary. I was never fired, period.
`Marchita, would you please take the stand? Would you tell the Jury what the conditions of this man's termination was at Bennett? He was fired.'
The Court: All right. I'll overrule the objection. That's legitimate  if he handles it that way. I just haven't heard any testimony about anything up to this point as far as work.
Mr. Kaplan: Well, it's 
The Court: Who is it you're going to call now?
Mr. Kaplan: I have Officer Gregg in the back. Just so we don't get interrupted, it was the same line on K-Mart. And I've got his separation, firing and termination report in here and they've stipulated to authenticity. So I'll run this into evidence also at the same time.
Mr. Glick: Judge, if I could, the deposition that Mr. Kaplan read, that was taken before, you know, the complaint in this particular case was filed. In other words, the deposition  You know the history of the case. I don't have to repeat that.
The Court: Sure.
Mr. Glick: That deposition was taken in conjunction with the original first lawsuit that was filed. As you know, we took the voluntary dismissal and refiled the complaint.
Mr. Kaplan: And there was an order entered incorporating all discovery from the prior case into this case.
The Court: Wait a minute. It doesn't deal with the question of whether he's claiming loss of wages or loss of money as far as employment's concerned. It simply goes to the question that allegedly, whatever, at some point he testified under oath in his deposition which would be read that he voluntarily left prior employment. And evidently, allegedly, that may or may not have been true. And somebody's going to come in and say, "No. He was fired."
Now, whatever weight that bears I don't know, but it goes to impeachment of that portion. I don't think it has anything to do with his claim for lost wages, lost earning capacity, et cetera. It just goes to the question of his veracity and believability.
So I guess that's a motion in limine I suppose you'll call that.
Mr. Glick: Yes sir.
The Court: I'll deny it then.
Initially, we hold that the objections interposed by Dempsey as set out above were sufficient to preserve this issue for appeal. See Fincke v. Peeples, 476 So.2d 1319 (Fla. 4th DCA 1985), rev. den. 486 So.2d 596 (Fla. 1986).
On the merits, Dempsey asserts that Ott's testimony was not proper impeachment of his credibility and highly prejudicial to his case, which was largely based upon the jury's conclusion as to the credibility of the two people involved in the accident. He relies upon Hitchcock v. State, 413 So.2d 741 (Fla.), cert. den. 459 U.S. 960, 103 S.Ct. 274, 74 L.Ed.2d 213 (1982) for the proposition that evidence of particular acts of misconduct cannot be introduced to impeach the credibility of a witness. See also Simmons v. Baptist Hospital of Miami, 454 So.2d 681 (Fla. 3d DCA 1984).
*377 Section 90.608, Fla.Evid. Code (1991) governs impeachment by contradiction:
(1) Any party, including the party calling the witness, may attack the credibility of a witness by:
* * * * * *
(5) Proof by other witnesses that material facts are not as testified to by the witness being impeached. (emphasis supplied).
The 1979 Sponsor's note to Section 90.608 states:
Where it is sought to impeach a witness on the basis of testimony given on cross-examination, the testimony must, of course, be relevant and material .. . [T]he test of relevancy and materiality is whether the cross-examining party could have, for any purpose other than impeachment, introduced evidence on the subject in chief. See Tully v. State, 69 Fla. 662, 68 So. 934 (1915); Lockwood v. State, 107 So.2d 770 (Fla. 2d DCA 1959). On cross-examination of a witness on collateral or irrelevant matters the answer given by the witness is conclusive and it is error to permit opposing counsel to introduce evidence contradicting the witness's answer. See State v. Statewright, 300 So.2d 674 (Fla. 1974).
In Faucher v. R.C.F. Developers, 569 So.2d 794, 804 (Fla. 1st DCA 1990), the rule was stated with clarity:
The law is well settled that it is improper to litigate purely collateral matters solely for the purpose of impeaching a party or witness. Once a question is put to the party or witness on a purely collateral matter for the purposes of impeachment, the proponent of the question is bound by the witness's answer; it is inappropriate to then try the truth or falsity of the answer on the collateral matter by adducing independent proof through other witnesses. Patterson v. State, 157 Fla. 304, 25 So.2d 713 (Fla.) cert. denied, 329 U.S. 789, 67 S.Ct. 352, 91 L.Ed. 676 (1946); O'Steen v. State, 506 So.2d 476 (Fla. 1st DCA 1987); McCormick on Evidence § 47 (3d ed. 1984).
See also Hernandez v. State, 575 So.2d 1321 (Fla. 4th DCA 1991); Gelabert v. State, 407 So.2d 1007 (Fla. 5th DCA 1981); Fuente v. State, 549 So.2d 652 (Fla. 1989). Ehrhardt comments on the rule in Florida Evidence, where it is stated:
There are general rules of limitations which are applicable to all methods of impeachment. If a witness is cross-examined concerning a collateral or irrelevant matter, the examiner is bound by the answer given. He must "take" the answer of the witness and may not subsequently introduce extrinsic evidence to impeach the witness.
The test for determining whether a matter is collateral and non-material so that evidence is inadmissible to contradict the answer of the witness is whether the impeaching evidence would be admissible for any purpose other than the contradiction. Apparently there are two kinds of evidence that pass this test: (1) evidence which is relevant to independently prove a material fact or issue; (2) evidence which would discredit a witness by pointing out the bias, corruption or lack of competency of the witness.
C. Ehrhardt, Florida Evidence 294-5 (2d ed. 1984) (footnote omitted).
We agree with Dempsey that evidence of his past employment and his departure therefrom was collateral and immaterial to the issues presented in this case since he made no claim for lost earnings or impaired earning capacity. Importantly, Shell has suggested no basis for admitting Dempsey's testimony concerning his former employment other than to serve as a basis to impeach him by calling his former employer. Accordingly, under the authority set out above, since Ott's testimony was not relevant to independently prove a material fact or issue in the case, such testimony amounted to improper impeachment evidence.
We can hardly find this error to be harmless in the face of the parties' agreement on appeal that the resolution of this case turned largely on the jury's view of the credibility of the parties' different accounts of the accident. By offering this evidence, *378 Shell suggested to the jury that because Dempsey was not truthful about something important, he was not credible in his other testimony. If the rules of evidence permitted impeachment of a witness's credibility by showing that he or she had told falsehoods about various matters on particular occasions, Shell's strategy would be sound. However, the law does not permit that form of impeachment.
In addition, the error was compounded when the witness described Dempsey as being careless and stated that carelessness was the reason for his discharge. This evidence could have bolstered Shell's position that Dempsey was careless in the incident in question, even though evidence of that past carelessness was not independently admissible to shed light on his conduct at the time of the accident.

CROSS EXAMINATION OF EXPERT
Dempsey next contends that the trial court erred in refusing to allow him to cross-examine Dr. Wattleworth on the issue of headlight sight distance. We agree.
Based upon his study and reconstruction of the accident, Wattleworth opined on direct examination that Irwin could not have avoided the collision, because by the time he saw Dempsey and reacted, it was too late. Wattleworth reached this conclusion by evaluating a skidmark on the roadway, Irwin's stated driving speed, and Irwin's perception/reaction time. However, by his own admission, Wattleworth did not factor into his calculus, the visibility that the illumination from the headlights of his vehicle would have provided Irwin of Dempsey.
On direct examination, Wattleworth testified that the size of a vehicle relative to that of a pedestrian and the fact that the vehicle had headlights, would generally make that vehicle visible at a much greater distance to a pedestrian than the pedestrian would be visible to the driver of the vehicle. This evidence was apparently offered to demonstrate that the plaintiff-pedestrian would have a greater opportunity to see and deal with the approaching vehicle. While we agree that this fact would be relevant to the issue of the pedestrian's conduct, we also conclude that the distance at which a motorist's headlights would reveal a pedestrian is relevant in evaluating the motorist's conduct. We believe that Dempsey was entitled to explore the specifics of this matter, and was improperly deprived of the opportunity to do so on cross-examination.
Shell contends that Wattleworth's nonreliance on the headlight sight distance in conducting the reconstruction and in offering his opinion was a sufficient basis for precluding cross-examination on that topic. We cannot agree. It is true that a trial court may regulate and control the extent of cross-examination within the bounds of reasonable discretion. Seminole Shell Co. v. Clearwater Flying Co., 156 So.2d 543 (Fla. 2d DCA 1963). However, this discretion is circumscribed by the following principles:
[W]hen the direct examination opens a general subject, the cross-examination may go into any phase, and may not be restricted to mere parts ... or to the specific facts developed by the direct examination. Cross-examination should always be allowed relative to the details of an event or transaction a portion only of which has been testified to on direct examination. As has been stated cross-examination is not confined to the identical details testified to in chief, but extends to its entire subject matter, and to all matters that may modify, supplement, contradict, rebut or make clearer the facts testified to in chief. ...
Zerquera v. State, 549 So.2d 189, 192 (Fla. 1989), citing to Coxwell v. State, 361 So.2d 148, 151 (Fla. 1978) (emphasis supplied) (citations omitted). See also McCrae v. State, 395 So.2d 1145, 1152 (Fla. 1980), cert. den. 454 U.S. 1041, 102 S.Ct. 583, 70 L.Ed.2d 486 (1981).
Visibility, like the above issue relating to credibility, was a critical issue to the determination of the cause or causes of the accident in question. In essence, Wattleworth's testimony was that by the time the motorist saw and reacted to the pedestrian, he could not avoid the accident. The question remains, however, as to whether the *379 pedestrian may have been visible to the motorist at an earlier point. This factor would seem to have been an appropriate consideration here, as it was uncontroverted at trial that it was dark outside when the collision occurred, and the area where it occurred had been poorly lit. A driver's ability to see, observe or become aware of a pedestrian under these conditions would almost certainly be affected by his or her headlights and the distance at which they project. In restricting Dempsey's cross-examination of Wattleworth, the trial court deprived Dempsey of the opportunity to show how Wattleworth's analysis may have been incomplete or inaccurate. Cf. Mathis v. O'Reilly, 400 So.2d 795 (Fla. 5th DCA 1981), rev. den. 412 So.2d 468 (Fla. 1982) (in vehicle accident negligence action where plaintiff's and defendant's expert witnesses in traffic accident analysis offered different opinions as to the pre-impact speed of the defendant's vehicle, it was reversible error to prohibit plaintiff from asking his expert witness to delineate the facts, factors, formulae and rationale used in the analysis leading to the defendant's witness's opinion, and to do the same as to his own opinion, and then compare the predicates upon which the two opinions were based).
Cross-examination of experts on relevant and material issues is especially important in view of the rules of evidence that permit experts to testify and express opinions without setting out in detail all of the predicates upon which the opinion or testimony may be based. Those matters are now left largely to be explored on cross-examination. Hence, if cross-examination is limited in the manner involved herein, an expert's views and the soundness thereof may go largely untested. Because this evidence could have reasonably affected the jury's verdict, we do not believe that the error in excluding it was harmless.

EXCLUSION OF EXPERT TESTIMONY
Dempsey also contends that it was error for the trial court to have excluded the testimony of Wiggins, a professional engineer, as to the results of an experiment he conducted in 1982 with regard to headlight sight distances. Wiggins was called to testify "concerning the availability of maximum distances relative to the envelope of light that would shine or cast out from headlights of a [vehicle]." The Wiggins testimony was based on a "static study" conducted in 1982 wherein a car was parked on a police driving range in Gainesville. A second person involved in the test process walked a distance from the car. The car's headlights were then turned on and that person proceeded back to the car. When the person came into the "envelope of headlights," a measurement was taken. Different measurements were taken based upon different colors of clothing worn by the person, and a graph of visibility distances was created. According to Wiggins, the purpose of the 1982 study was to define the maximum distances at which a pedestrian could be seen from a vehicle with low beam headlights when the pedestrian wore various colors of clothing. Wiggins also testified as to his familiarity with the headlights on the vehicle involved in this accident and their similarity to the ones involved in his tests.
Arguing against admission of Wiggins' test results, counsel for Shell referred to the need for Dempsey to show that the tests were conducted under conditions substantially similar to those prevailing at the accident scene. After cross-examination, the trial court offered the following reasons for sustaining the objection as to the admissibility of the test:
One, that it was a specific test conducted in conditions which in this court's opinion have too many variables with the conditions that we are talking about in this accident, and I don't believe this specific test under those conditions with these variables can be used as an opinion in this particular case under these particular set of circumstances.
The court went on to explain:
What I do quarrel with is the circumstances of taking a test back in 1982 or whenever it was under conditions which at least in my opinion are tremendously dissimilar from the conditions that we're talking about, and we have a car approaching *380 an intersection. Now, we have a question of reaction time. We have a question of is it reasonable to observe the intersection, or are we looking always at the envelope of light. And I just think there are too many variables under these circumstances.
Three sections of the Florida Evidence Code deal with the subject of the admissibility of opinion evidence given by an expert. Section 90.105 states that the trial court shall determine preliminary questions concerning the admissibility of evidence. As to data underlying an expert opinion, Section 90.704 states that the facts or data upon which an expert bases an opinion or inference may be perceived or made known to him at or before trial. And, subsection 2 of Section 90.705 provides that before an expert witness gives his opinion, the party against whom the opinion is to be offered may conduct a voir dire examination directed to the underlying facts or data. If prima facie evidence is presented that an expert does not have a sufficient basis for the opinion to be given, the opinion is inadmissible unless the party offering the testimony establishes the underlying facts or data.
In Ford Motor Company v. Cochran, 205 So.2d 551, 553 (Fla. 2d DCA 1967), cert. den. 211 So.2d 212 (Fla. 1968), the Second District held that in order for evidence of an expert's experiment to be admissible, it is not necessary that the conditions of the experiment be exactly identical to the incident about which the experiment is conducted. But, if conditions are dissimilar in an essential particular, evidence of the experiment should be rejected.
This court has recognized that an expert opinion is inadmissible where it is apparent that the opinion is based on insufficient data. In Husky Industries, Inc. v. Black, 434 So.2d 988, 993, footnote 8 (Fla. 4th DCA 1983), with specific reference to Section 90.705, Fla.Evid.Code, we noted that the counterpart to the rule which renders an expert opinion inadmissible if based on insufficient data is the rule which makes results of experiments conducted under dissimilar circumstances inadmissible (citations omitted). In sum, the rule of "substantial similarity" requiring the important factors in an experiment to be similar to those involved in the subject accident, is still a part of Florida law.
Dempsey cites to two decisions which we find consistent with the rule of substantial similarity. The first of these is Vitt v. Ryder Truck Rentals, Inc, 340 So.2d 962 (Fla. 3d DCA 1977). The Vitt court concluded that the dissimilarity between the test conditions and the conditions surrounding the collision giving rise to the litigation there were not such as to destroy the validity of the conclusions which could be drawn by the jury from the evidence of the tests. Id. at 965. The other decision is Rindfleisch v. Carnival Cruise Lines, Inc., 498 So.2d 488 (Fla. 3d DCA 1986), rev. den. 508 So.2d 15 (Fla. 1987). The court there noted that if enough of the obviously important factors involved in an accident are duplicated in the experiment, and if the failure to control other possibly relevant variables is justified, the court may conclude that the experiment is sufficiently enlightening that it should come into evidence. Id. at 493. The court went on to conclude that the issue is usually one of weight to be given the evidence rather than one of relevance or materiality. Id.
Our difficulty with the trial court's ruling here is that we find no factual basis to support the trial court's conclusion that the important circumstances involved in the accident and the experiment were dissimilar. It does appear that there was some confusion over where the test was conducted. Defense counsel alluded to the test being done in the "woods" of North Florida. There was also a mistaken reference to a test being done on a "golf course." However, the evidence shows that the test was conducted on a paved police department driving range. Since the test basically involved a measurement of the distance headlights would project ahead on a flat level surface, we fail to see any substantial dissimilarities that would prevent the admission of these test results. This is especially true since the expert testified that the headlights of the vehicle tested and the *381 vehicle involved in the accident were similar. We note that on deposition, Shell's own expert, Wattleworth, admitted considering the same test results in evaluating visibility distances.
Of course, speed and other specific conditions at the scene of the accident would logically affect visibility on the night in question. Those matters, however, would affect the weight to be given this evidence, not its admissibility. Under these circumstances, we believe the test results should have been admitted.
Accordingly, for the reasons set out above we reverse and remand for a new trial.
POLEN and GARRETT, JJ., concur.