975 So.2d 615 (2008)
James TYRRELL, Appellant,
v.
STATE of Florida, Appellee.
No. 4D05-183.
District Court of Appeal of Florida, Fourth District.
March 5, 2008.
*616 Leah H. Mayersohn, Fort Lauderdale, for appellant.
Bill McCollum, Attorney General, Tallahassee, and James J. Carney, Assistant Attorney General, West Palm Beach, for appellee.
GROSS, J.
James Tyrrell appeals his conviction of misdemeanor battery. Originally he was charged with three counts of sexual battery on a person twelve years of age or older, all second degree felonies. See § 794.011(5), Fla. Stat. (2003). Before trial, the state made a plea offer of community control and probation. The court explained to the defendant that he faced 45 years in prison, with 22 years being the bottom of the sentencing guidelines. Tyrrell rejected the offer and went to trial. The jury found Tyrrell not guilty on one count and guilty on two counts of the lesser included charges of misdemeanor battery. With the agreement of the state, the court merged the two battery counts for sentencing. The circuit judge sentenced Tyrrell to one year of probation with a special condition of 150 days in jail. The judge said that "in no way" was Tyrrell "punished by exercising his right to trial." We affirm the conviction.
In December 2003, the 19 year old victim came to Florida to visit her sister Courtney. In preparation for the visit, Courtney secured a fake identification card for the victim.
On December 19, Courtney took her sister to her company's office party at Max's Grille in Fort Lauderdale. Courtney and Tyrrell worked together. Tyrrell drove a group that included the sisters to the party. They arrived at about 8:00 p.m., and were there until approximately 11:30 p.m. While at the party, both Tyrrell and the victim drank liquor. The victim and Tyrrell then walked with a group to Rush Street, another bar.
Courtney wanted to leave Rush Street at 2:00 a.m. The victim decided to stay, because she had been drinking and "dancing a little bit" with Tyrrell and "started to have a little bit more fun." Tyrrell offered to let Courtney use his car because he did not want to leave it in a garage overnight. Tyrrell told Courtney that he had "plenty of money to get [the victim] in a cab," and would make sure the victim got home.
*617 After Courtney left, the victim and Tyrrell went to another club, where they had more to drink. They left together and hailed a cab. Inside the cab, they started kissing with their arms around each other and the victim testified that she let Tyrrell "penetrate" her vagina with his finger. The cab arrived at Tyrrell's house. After paying the fare, Tyrrell and the victim were out of money. Tyrrell said to "come into his place" to "figure out a way for [the victim] to get home." At that point, the victim "didn't feel like [she] had any other options."
Inside the house, the victim said that she and Tyrrell started "kissing a little bit more and he had fingered me a little bit, which I was not okay with, but I didn't know what to do or how to react. I didn't know how far I wanted it  to let it go. And there came a point where he started pulling off my skirt. And I said, `No.'" After she said no, they "reverted back to kissing, which was fine with me again. I just  I thought that was going to be okay so I just went along with that. And then he just pulled his penis out and like penetrated me. I didn't even know that it was coming." After two thrusts, the victim told Tyrrell, "No, I don't want to do this." Tyrrell apologized. The victim started to call her sister, but Tyrrell talked her out if it "because his car was at [Courtney's] place and he had to go get his car in the morning anyway." He offered that she spend the night at his place. He said "[j]ust come upstairs and we'll just go to sleep."
The victim agreed to spend the night They went upstairs and she "just lay down in bed and passed out." She slept in her long skirt and velvet top. Tyrrell was also clothed. Before falling asleep, the victim remembered Tyrrell's roommate, Ariel Martinez, coming home, looking into the bedroom, and saying hello. Martinez testified that he heard giggling from Tyrrell's bedroom.
When the victim next woke up, Tyrrell was on top of her, pulling off her skirt. She "pushed him off" and said, "No, I don't want to do that. I don't want to do this with you." Tyrrell said he was sorry. The victim rolled over and went back to sleep. The victim was feeling the effects of the alcohol. She woke up a second time to the defendant penetrating her with his penis. She pulled away from him, rolled over, and "went back to sleep." At this time, the victim still had her skirt on.
The third time the victim woke up, she said that Tyrrell "was inside me again in the same position with his penis. And  and when I went to go pull away, he . . . was holding onto my hips. And when I went to go pull away he just penetrated me anally." The victim was disgusted and mortified. She pulled away to get up and went into the bathroom. Her skirt was off. She saw a little bit of blood.
Mad and wanting to leave, the victim looked for her skirt. She could not find it, so she put on a pair of red shorts from the floor. She found her cell phone by the bed and her skirt between the bed and the wall. She got dressed and started to leave.
Tyrrell grabbed the victim's arm and asked why she was leaving. The victim said that she wanted to go home, but she had lost her camera. They both went to look for the camera. Tyrrell found it in the purse of a girl who had come home with his roommate, Martinez. Martinez and his female guest then came downstairs. The victim said nothing about what happened in the bedroom; she was mad because she thought her camera had been stolen.
Tyrrell and the victim left in Martinez's car bound for Courtney's apartment. *618 Along the way, the car stalled in the middle of the road. The victim started walking, but decided to call Courtney. Tyrrell discouraged the victim from calling her sister, saying, "She's going to be mad you woke her up. She's going to think I'm a rapist." A police officer arrived at the stalled car. The victim did not approach the police officer.
Courtney received a call from her sister at 6:00 a.m. asking to be picked up. When Courtney arrived, she saw the defendant without shoes, dressed in shorts and a sweatshirt. Courtney testified that Tyrrell appeared "heavily intoxicated" while the victim "seemed fine." They drove back to Courtney's apartment; she gave Tyrrell the keys to his car and told him to go home.
After Tyrrell left, the victim told her sister what had happened. The victim showered. Sometime after 8:00 a.m., they called the police. An officer arrived in 20 minutes. Later that day, the victim went to the Sexual Assault Treatment Center.
At the Center, nurse Sandra Gibson examined the victim. Nurse Gibson testified as an expert in the area of sexual assault treatment exams. She looked at the victim's clothes from the night before and saw no tears or evidence that they had been "roughly handled." She used a diagram of the victim's vaginal area to explain her testimony. She described two tears in the victim's "labia menora [sic] . . . about one-to-three millimeters, and they had a erythemitus [sic] base. Erythemita, erythema just relates to what was defined as redness." The nurse interpreted these tears and redness as indicating "an acute or a new injury." The nurse described another tear of "about two to four millimeters" with a "red base" between the "base of the vagina" and the anus. The nurse described another tear at the entry of the anus. The tears the nurse observed were new injuries that would start to "significantly heal" within 72 hours. The nurse opined that the injuries she observed were consistent with the non-consensual "penetration vaginally, digitally, and . . . anally" that the victim had described.
Nurse Gibson did not take photographs of any of the victim's injuries, although it was her practice to photograph documented injuries. She could not recall why she took no photographs in this case.
Tyrrell gave a taped statement to a detective that the state played for the jury. In the statement, he first denied that he and the victim had engaged in sex. He said that they were on the couch in the living room, not in a bedroom, when his roommate Martinez arrived home. Later, he admitted to digitally penetrating the victim, but said he was drunk; then, he conceded that he had gone upstairs with the victim and gotten into bed. Tyrrell denied penetrating the victim with his penis. At trial, Tyrrell did not testify.
Part of the defense was that the injuries observed by the nurse were caused by the victim's aggressive use of a dildo. The victim received the dildo on November 15, as a birthday gift from a friend. The defense obtained two court orders for the victim to produce the dildo, but she never complied. She described the dildo in her testimony: "[t]an-colored. It's about five inches long. It's like two-inch circumference maybe. It has an extra part on it for clitoral stimulation." The victim said she did not use lubricant with the dildo and penetrated herself just with the tip.
On July 23 and August 2, 2004, the trial court ordered the victim to "produce the sex toy and/or dildo discussed in her depositions within 15 days." The court also ordered the victim to make certain medical records available to the prosecutor.
*619 Tyrrell first argues that his "right to due process and right to confront witnesses" was violated because the state did not produce the items that were the subject of the July 23 and August 2 orders. However, it was the victim, not the state, who was ordered to produce. The defense never moved to hold the victim in contempt for failing to turn over the dildo and medical records; there was no showing that the state possessed the items and withheld them from the defense. At trial, the victim described the dildo and explained in detail how she used it. Even if there was error in the court's ruling about the dildo, the error was harmless. The jury did not need to see the actual dildo to understand the testimony or the nature of the defense.
Tyrrell also complains about not having production of certain of the victim's medical records. Because the trial court correctly ruled that the victim's panic attacks prior to her encounter with Tyrrell were irrelevant, there was no constitutional error in the victim's failure to produce the records about the panic attacks. The defense was attempting to establish the importance of the absence of a panic attack after the victim's encounter with Tyrrell; however, the trial court found the earlier panic attacks too tenuous and remote to be admitted. One attack was the result of stress in school two years before the incident. The defense proffered no expert testimony that would make the significance of the absence of a panic attack anything more than a wild hypothesis.
Next, Tyrrell contends that the trial court erred in failing to let him show the victim a dildo lineup. As he explains in his initial brief, the defense "performed an exhaustive search to find a matching dildo. Upon learning that none existed," the defense "acquired multiple similar looking devices" to display to the victim so that she could "find one that looked similar for comparison." The trial judge disallowed the use of visual aids "not directly related to the charge." We find no abuse of discretion in this ruling on the relevance of demonstrative evidence. See § 90.401, Fla. Stat. (2007); State v. Wright, 473 So.2d 268, 269-70 (Fla. 1st DCA 1985). The defense extensively explored the dildo issue with the victim on cross examination.
Tyrrell next asserts that the trial judge wrongfully limited his ability to cross-examine the victim about why she would lie about her encounter with him. However, the trial court allowed the defense to bring out the victim's disagreement with Courtney earlier that day over another man, as well as the victim's admitted lie in her deposition about her sexual encounter with a former boyfriend. This testimony covered the issues the defense identified in the proffer at trial.
We find no error in the trial court's exclusion of certain testimony from an expert. The court precluded a former medical examiner from testifying as to whether the victim's alcohol level was "at or below the legal limit" when she was at Tyrrell's apartment. There was no evidence of any blood alcohol test, only the victim's testimony about the mixed drinks she consumed at various bars, without any evidence as to the amount of alcohol in any drink. There was thus insufficient data for the proposed opinion. See § 90.704, Fla. Stat. (2007); Dozier v. Hodges, 849 So.2d 1094, 1095 (Fla. 3d DCA 2003); Dempsey v. Shell Oil Co., 589 So.2d 373, 380 (Fla. 4th DCA 1991). On another issue, the same expert was allowed to indirectly criticize the failure of Nurse Gibson to take photographs of the victim's injuries by pointing out that he drew conclusions from drawings on paperwork in a minority of cases, "usually in very rural backward *620 third world countries." The defense thus highlighted deficiencies in the state's evidence gathering technique.
Finally, Tyrrell argues that the trial court abused its discretion in denying a continuance so that it could procure the testimony of an expert urologist. We find no preserved error.
Defense counsel proffered one aspect of the urologist's testimony: because Tyrrell's penis was "smaller than average size" it "could not have caused" the injuries that Nurse Gibson observed during the rape exam. Before calling her first witness, defense counsel learned that the urologist was in surgery and would not be available that morning. Defense counsel said, "I just got off the phone with him. He's in surgery. He was supposed to have been here originally around 11:00. He'd requested it according to his schedule. I just got off the phone. He's going to be in surgery all day today." The judge agreed to end early that day so that the urologist could testify the next morning. The judge also said, "But I'm not going to continue his testimony for four days." The next morning, defense counsel stated, "My witness is not available unfortunately. So we're going to rest." She explained to the court that even though the witness was under subpoena, "with everything that was going on with [the urologist] yesterday with the emergency surgery and everything, he's not available."
Defense counsel did not move for a continuance on the morning when the urologist failed to appear. She did not tell the court when the witness could appear. She did not move to enforce the subpoena. She did not attempt to get the state's agreement to perpetuate the expert's testimony under Florida Rule of Criminal Procedure 3.190(j). Under these circumstances, where there was no concrete motion for a continuance, the trial court did not err by failing to recess the trial for some undetermined time in the future.
Affirmed.
WARNER and FARMER, JJ., concur.