49 So.2d 332 (1950)
CORNELIUS
v.
STATE.
Supreme Court of Florida, Division B.
December 12, 1950.
W.N. Burnside, Frank P. Ingram and J. Oswald Cornelius, all of Tampa, for appellant.
Richard W. Ervin, Atty. Gen., Murray Sams, Jr., and Frank S. Cannova, Asst. Atty. Gen., for appellee.
*333 HOBSON, Justice.
On the 29th day of August, 1949, a true bill was filed against the defendant (appellant here) Ward C. Cornelius, charging the said Cornelius with the crime of murder in the first degree. Upon trial the jury rendered a verdict finding Ward C. Cornelius guilty of manslaughter.
In their brief counsel for appellant stated, "* * * this whole case is based upon the plea of self defense and the reasonable fear of the defendant for his life or of great bodily harm * * *."
Not only do we fail to find harmful and, therefore, reversible error but we also conclude from the testimony (and the reasonable inferences properly deductible therefrom) of the appellant Ward C. Cornelius that the jury was justified in rejecting his plea of self defense as well as his contention that he had a reasonable fear for his life or of great bodily harm.
Ward C. Cornelius' version of what took place just prior to and at the time he admittedly shot J.P. Lane five times thereby effecting the death of the said J.P. Lane is gleaned from the following testimony given by the appellant:
"Q. Tell the Court what happened that morning? A. I started back up Florida Avenue and came to Florida and Polk, and there was a car ahead of me and I stopped for the red light, and I was looking out of the window and somebody says, `Hee, hee, hee, Hello, Hello, How are you getting along?' I kind of glanced over that way and it was J.P. Lane and I says, `Say, I want you to tell me where my little girl is.' He looked up at me over his glasses like that, and says, `I'll not tell you anything.' I just headed up there a little bit, I didn't block him, his car would about hit the back of my tire when I pulled in there a little bit to an angle, just enough to let folks by, and I got out and I came back and I says, `I want you to tell me where my little girl is' and he says, `I'll not tell you anything.' I ran my hand in there and cut his switch and I figured 
"Mr. Farrior: I object to what he figured. Let him state what was said and done there.
"The Witness: (continuing) `He started to roll the glass up on me and I opened the door and he locked the door on me, and he was saying something back of the glass but I couldn't understand. I walked around in front and came back on the other side, and the glass was up like that, and so I unlocked the door and slid in with this thigh in on the cushion like that, and he says, `Don't you put your hands on me. if you do I will kill you.' I said `Listen, what I want is to know where is my little girl.' He says, `I'll not tell you anything.' And says, `Don't you put your hands on me,' and that is what he said, `I'll not tell you anything,' and `Don't put your hands on me,' and he says, `Get out of my car or I will kill you', and he had his thighs close together and he was reaching back like this (indicating someone trying to reach a back pocket with his right hand), and he says, `Get out of my car or I will kill you,' and as he was doing that way (indicating as before) I slid to the door and reached for the key, and he says, `Don't you touch that key, don't you put your hand on that key or I will kill you,' and I slid out and I pulled my gun and fired at what I thought was intended to kill me. A man that will stand in the Church  "
The appellant testified on cross examination as follows:
"Q. You illustrated to the jury here that at the time you shot him he was reaching back like that? A. That is right, he slapped his hand back like he was getting one, jiggling. (Indicating a nervous effort to get something out of his pocket)
"Q. And reached his hand behind him? A. That is right.
"Q. And that is when you shot him? A. I got out as quick as I could and pulled my gun and fired immediately.
"Q. You never saw a single thing in his hand or on the seat, no gun, no knife, no stick, no nothing? A. Not while I was in the car.
"Q. At any time prior to your shooting you didn't see anything? A. No.
"Q. You didn't see any gun or knife or stick or anything before the shooting? A. No sir, I didn't know what he had.
*334 "Q. You saw his hand and you didn't know what he had? A. I saw him reaching for it, reaching back.
"Q. You didn't see any knife or gun or any object other than his bare hands? A. Not when I first entered.
"Q. And you didn't see any at the time you say you fired? A. I didn't look at him any more until I dashed out of the car.
"Q. Did you see any gun or did you see anything in his hand? A. I couldn't tell what he had in his hand then, I couldn't see his hand. I could for awhile but I couldn't after he run his hand down behind him.
"Q. But at no time did you see any object in his hand? Answer yes or no? A. I didn't see any when I sat in the car by him.
"Q. You didn't see anything in his hand at any time, did you?
"The Court: Answer the question.
"The Witness: No, I didn't see anything in his hand at any time. I will answer that. (Italics supplied.)
The jury was justified in concluding after having heard the appellant's foregoing testimony and without consideration of other competent evidence which supports such conclusion, that he did not act in self defense, did not have reasonable fear for his life or of great bodily harm and indeed could have determined that appellant was in fact the aggressor. The only threats made by J.P. Lane are disclosed by the following excerpts from appellant's testimony: "And he says, `Don't you put your hands on me, if you do I will kill you.' I said, `Listen, what I want is to know where is my little girl.' He says, `I'll not tell you anything.' And says, `Don't you put your hands on me' and that is what he said, `I'll not tell you anything,' and `Don't put your hands on me,' and he says, `Get out of my car or I will kill you,' and he had his thighs close together and he was reaching back like this (indicating someone trying to reach a back pocket with his right hand), and he says, `Get out of my car or I will kill you,' and as he was doing that way (indicating as before) I slid to the door and reached for the key, and he says, `Don't you touch that key, don't you put your hand on that key or I will kill you,' and I slid out and I pulled my gun and fired at what I thought was intended to kill me. A man that will stand in the Church  "
According to the foregoing testimony, J.P. Lane, in each instance before using the words "I will kill you", admonished the appellant. His admonitions were: to not put his hands on him, to get out of deceased's car and to not touch the ignition key. Under such circumstances the only requirement of the appellant in order to avoid being killed (if indeed the testimony as a whole is susceptible of the construction that J.P. Lane was in a position, or had the dangerous instrumentality necessary, to effect the death of the appellant) or to avoid the alleged necessity of taking the life of another in self defense, was to not put his hands on J.P. Lane or get out of J.P. Lane's car, or refrain from touching the ignition key. All of these matters of commission or omission were within the power of the appellant to do or refrain from doing. In fact, the appellant did get out of the car, but instead of being content with removing himself from any possible position of reasonable fear for his life or safety, he deliberately pulled his gun, fired at and killed J.P. Lane, in lieu of walking or running away from the encounter which appellant had obviously precipitated. That he had ample opportunity to flee instead of fumbling in his overalls for his gun, is evidenced by the testimony of David J. Harwell, an eye witness who testified in part as follows:
"Q. Then, how long, you say when this man was there trying to get his gun out of his overalls or pocket, how long could you estimate that he was standing there trying to get them out? A. Well, I would estimate, I would say 
"Mr. Burnside: I think that calls for highly improper evidence. If he can state accurately, not as to his opinion or conclusion about it.
"The Court: I think he can state that.
"The Witness: I would say about a minute.
"By Mr. Farrior:
*335 "Q. What was he doing during that minute? A. Well, trying to get whatever, what appeared to be a gun out of his overalls."
We again state the jury was justified in concluding that appellant did not act in self defense when he shot and killed J.P. Lane and that he did not have reasonable fear for his life or safety, particularly in view of the fact that the appellant finally on cross examination admitted that he did not "see anything in his (meaning J.P. Lane's) hands at any time."
Appellant contends that the trial court committed reversible error when the states attorney was allowed, over objections of the defendant, to cross examine defendant's character witnesses, who testified that the general reputation of the defendant for being a peaceful and law-abiding citizen was good, by questioning said witnesses as to specific acts of turbulence and violence of the defendant. We do not find that harmful error was committed by allowing this type of cross examination. See Fine v. State, 70 Fla. 412, 70 So. 379; Carnley v. State, 143 Fla. 756, 197 So. 441.
We hold that a witness who has testified as to general reputation or character may on cross examination be interrogated as to whether he had ever known or heard of specific acts of violence committed by the accused because the true purpose of such cross examination is to enlighten the jury as to whether the witness actually  as a matter of fact  knows the general reputation of the defendant and to place the jury in a better position to pass upon the credibility of the witness' testimony.
It is further contended by the appellant that the trial Judge erred in allowing rebuttal evidence of specific acts of violence or turbulence after the defendant had placed in issue his general reputation for being a peaceful and law-abiding citizen. This contention appears to be well taken but it does not follow that the error was harmful or prejudicial. The general rule is as stated in 32 C.J.S., Evidence, § 436, p. 68, "As a general rule, specific acts, whether of good conduct or bad conduct, cannot be shown in rebuttal of evidence as to character."
We have followed the general rule in several cases. See Roberson v. State, 40 Fla. 509, 24 So. 474; Gafford v. State, 79 Fla. 581, 84 So. 602.
Section 924.33, Florida Statutes 1941, F.S.A., reads as follows: "No judgment shall be reversed unless the appellate court after an examination of all the appeal papers is of the opinion that error was committed which injuriously affected the substantial rights of the appellant. It shall not be presumed that error injuriously affected the substantial rights of the appellant."
This Court has specifically held that a reversal should not be ordered unless the error complained of was prejudicial or harmful to the substantial rights of the accused and that the introduction of improper or inadmissible evidence must be prejudicial in order to warrant a reversal. Salter v. State, 152 Fla. 284, 10 So.2d 809; Kelly v. State, 145 Fla. 491, 199 So. 764; McCall v. State, 113 Fla. 469, 152 So. 19; Thomas v. State, 96 Fla. 243, 118 So. 22; Fouts v. State, 101 Fla. 1248, 133 So. 81; Martin v. State, 100 Fla. 16, 129 So. 112; Wallace v. State, 41 Fla. 547, 26 So. 713.
In determining whether the error of which complaint is made was harmful or prejudicial, we must decide upon examination of all the evidence whether the result would have been different had the improper evidence been excluded. The evidence in this case "leaves no room for reasonable doubt of the defendant's guilt" of manslaughter and the admission of the rebuttal testimony with which the appellant finds fault did not constitute harmful or prejudicial error. We find from the evidence that the appellant received a fair and impartial trial and conclude from the jury's verdict of guilty of manslaughter, when it reasonably could have found a verdict of guilt of a higher degree of homicide, that the jury was not in fact prejudiced against the appellant.
We have considered other questions raised by appellant based upon his assignments of error and do not find that harmful *336 or reversible error was committed by the court below.
The judgment from which this appeal was prosecuted is affirmed.
ADAMS, C.J., and CHAPMAN and SEBRING, JJ., concur.